IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

NATIONAL LIABILITY & FIRE
INSURANCE COMPANY,

    *Plaintiff,*

v.

RONALD ROODING,

    *Defendant.*

Civil Action No.: ELH-15-2572

## MEMORANDUM

This Memorandum resolves competing motions – one seeking to vacate an order of default and one seeking a default judgment.

National Liability & Fire Insurance Company ("National"), plaintiff, filed suit against defendant Ronald Rooding on August 31, 2015, seeking a declaratory judgment as to its obligations under two marine insurance policies issued to Rooding. ECF 1. In particular, National seeks a declaration that the marine insurance policies do not provide coverage for a claim submitted by Rooding arising out of the loss of the vessel MARGARITAVILLE (the "Vessel") (*id.* ¶ 2), and that the policies "are null and void *ab initio*. . ." *Id.*[1] Both policies preclude coverage if the insured "has omitted, concealed, misrepresented, sworn falsely, or attempted fraud in reference to any matter relating to this insurance before or after any loss." ECF 1 ¶ 33; *see also* ECF 1-2.

---

[1] The Court has subject matter jurisdiction under 28 U.S.C. § 1333, because the action concerns maritime contracts, giving rise to admiralty jurisdiction.

On February 4, 2016, after National effected service on Rooding by alternative means (ECF 20, ECF 21; *see* ECF 16), plaintiff filed its "Motion for Entry of Default of Defendant." ECF 22.  The Clerk entered an order of default on February 5, 2016.  ECF 23.  Several weeks later, on March 16, 2016, defendant filed his "Motion to Vacate Entry of Default."  ECF 25 (the "Motion to Vacate").  It does not include a memorandum or exhibits.  The next day, on March 17, 2016, plaintiff filed "Motion for Entry of Default Judgment," (ECF 27), supported by a legal memorandum (ECF 27-1) (collectively, the "Motion for Default Judgment"), and lengthy exhibits.  Plaintiff subsequently submitted an opposition to the Motion to Vacate (ECF 29, the "Opposition"), supported by numerous exhibits.  Rooding did not respond to the Motion for Default Judgment.  Nor did he reply to the opposition to the Motion to Vacate.

No hearing is necessary to resolve the motions.  *See* Local Rule 105.6.  For the reasons that follow, I shall grant the Motion to Vacate and deny the Motion for Default Judgment.

## I.     Factual and Procedural Background[2]

On or about August 16, 2014, Rooding purchased the Vessel from Jack Franklin for the sum of $9,515.00.  ECF 1 ¶ 9.  The Vessel was a 30-foot 1978 Trojan yacht.  *Id*. ¶ 4.  However, Rooding did not obtain a Certificate of Title to the vessel from the Maryland Department of Natural Resources until April 29, 2015.  *Id.* ¶ 9.  Rooding allegedly represented on his Application for Title that he had paid $3,500 for the Vessel.  *Id.*  Rooding kept the Vessel in a slip located at River Watch Marina in Middle River, Maryland, on a tributary of the Chesapeake Bay.  *Id*. ¶ 10.

Rooding endeavored to procure insurance for the Vessel on or about August 15, 2014, and contacted National's underwriting agent.  *Id*. ¶ 11.  According to plaintiff, Rooding was told

---

[2] Given the posture of the case, the facts are gleaned from the Complaint.

that the Vessel could be insured only for Rooding's "financial investment" in the Vessel.  *Id.*

However, Rooding allegedly sought coverage of $25,000 on the hull.  *Id.*  On August 16, 2014,

National issued Policy No. 3792430-14 (ECF 1-2, the "First Policy"), with the effective date of

August 16, 2014 through August 16, 2015.  *Id.*  It provided hull liability coverage of $25,000.

*Id.*; *see* ECF 1-2.[3]

National alleges, *id.* ¶ 12:

> The cover letter enclosing the First Policy informed Rooding that to
> maintain the coverage, Rooding needed to provide: (1) an acceptable condition
> and value marine survey; (2) a copy of the "sales agreement" for the Vessel; and
> (3) a completed and signed Marine Insurance Application.  The Marine Insurance
> Application provided to Rooding contained certain pre-filled information,
> including an entry of "$25,000" as the "Boat Purchase Price."  Rooding never
> signed or returned the Application or the Bill of Sale.  He also did not send a
> survey to the underwriter until many months later.

National further submits that a marine survey of the Vessel was conducted, which

indicated that a valve leading to the intake hoses for the head and "wash down system" was

"missing a required dedicated handle to open and close the valve."  *Id.* ¶ 13.  And, the "hull

valve (or seacock) with the missing handle was later determined to have been stuck in the open

position" when the First Policy was issued, "unknown and unreported" to National.  *Id.* ¶ 14.  As

a result, the Vessel was "defective and unseaworthy" when the First Policy was issued on August

16, 2014.  *Id.*

On December 4, 2014, the First Policy was terminated for non-payment of the premium.

*Id.* ¶ 16.  Rooding requested another insurance policy from National on January 22, 2015.  *Id.* ¶

18.  On January 26, 2015, National "determined that the Vessel could be insured under a no

navigation ('port risk') policy, so long as Rooding removed a 110 volt electrical outlet from the

---

[3] According to National, its agent, BoatUS, is also a party to the contract.  BoatUS
services boat and yacht insurance.  ECF 1 ¶ 3.

aft cockpit compartment. . . .", because that was considered "a safety hazard . . . ."  *Id*.  On January 23, 2015, National sent Rooding an insurance application, which reflected a "Boat Purchase Price of $25,000."  *Id*. ¶ 19.  Rooding signed and submitted the application.  *Id*.

After Rooding advised that the outlet had been removed on April 3, 2015, National issued Policy No. 3842216-15 (ECF 1-3, the "Second Policy"), to run on a "'no navigation' basis" from March 31, 2015 to March 31, 2016.  ECF 1 ¶ 21.

Rooding executed another version of the Marine Insurance Application form for the Second Policy, dated April 8, 2015.  ECF 1 ¶ 22.  "On this version of the form, Rooding removed the $25,000 figure placed on the 'Boat Purchase Price' subject line, and left the line blank."  *Id*.  According to National, it subsequently increased Rooding's Hull insurance to $26,500, based on representations by Rooding as to the installation of equipment on the Vessel.  *Id*. ¶ 23.  It also provided coverage of $6,200 for Rooding's personal effects.  *Id*.

On May 1, 2015, in Claim No. 1502226, Rooding notified plaintiff that the Vessel had sustained "significant water damage due to a sinking incident of an unknown cause that occurred on an unknown date."  *Id*. ¶ 24.  However, Rooding was unable to offer plaintiff an explanation of how or when the Vessel sank.  *Id*. ¶ 25.

National's investigation revealed defects in the Vessel that, in its view, rendered the Vessel defective and unseaworthy before one or both policies were issued.  *Id*. ¶¶ 28-31.  It also alleges, *id*. ¶ 31:  "Had the boat been properly winterized, the failure would not have occurred."  National asserts, *id*. at ¶ 34:

> After performing the investigation referred to above, National Liability determined that there was no coverage available to Rooding under the Policies for the reasons set forth in the claim denial letter dated August 5, 2015, which is attached hereto as Exhibit C [ECF 1-4] and incorporated herein by reference.  In sum, coverage was not extended for Rooding's claim because Rooding could not establish that the reported sinking occurred during the periods that the Policies

were in force, or on or between August 16, 2014 and December 4, 2014 or on or between March 31, 2015 and the date the loss was reported, May 1, 2015.

Further, National states, *id.* at ¶ 35:

>       Following further investigation of Rooding's claim, by letter dated August 27, 2015, incorporated herein by reference and attached hereto as Exhibit D [ECF 1-5], National Liability notified Rooding that the Policies were void *ab initio*, for the reasons stated in its letter (which is incorporated herein by reference), including, but not limited to, breach of the doctrine of *uberrimae fidei*, unseaworthiness at the inception of coverage, and concealment/misrepresentation in violation of the Fraud and Concealment clauses contained in the Policies.

National contends that Rooding "violated his duty to National Liability by misrepresenting material facts and by omitting material facts." *Id.* ¶ 45. In particular, plaintiff contends that defendant misrepresented the purchase price of the vessel as $25,000 when the actual purchase price "was $9,515.00 or $3,500." *Id.* ¶¶ 45a, 45b. Plaintiff also asserts that defendant failed "to disclose unseaworthy conditions aboard the Vessel prior to the inception of coverage on August 17, 2014 and again prior to the inception of coverage on March 31, 2015." *Id.* ¶ 45g. According to plaintiff, there is no coverage under the policies because "the Insured [] failed to indicate or rely upon any cause for the sinking and cannot demonstrate that the claimed loss occurred during the effective policy dates." *Id.* ¶ 49.

On September 1, 2015, the Clerk issued a summons for service on the defendant. ECF 5. On November 10, 2015, plaintiff filed an amended complaint correcting the zip code for defendant. ECF 11. Thereafter, on November 11, 2015, the Clerk issued a new summons using the corrected zip code. ECF 14.

National maintains that two attempts were made to serve Rooding by mail under Fed. R. Civ. P. 4(d), and both were unsuccessful. ECF 15 ¶ 4; ECF 15-1 at 14-15. According to National, one letter was returned to National on November 9, 2016 [sic], with the word "Unknown" handwritten on the envelope, and the envelope had been opened. ECF 29 at 3. *See*

ECF 15-1 at 14.  Plaintiff asserts that "[t]he handwriting appeared to be Mr. Rooding's."  ECF 29 at 3.  The other envelope was returned on November 17, 2015, with handwriting on the envelope that said:  "Unkown [sic] return to sender."  ECF 15-1 at 15; *see* ECF 29 at 4.

On December 11, 2015, plaintiff filed a "Motion for Order Extending Time for Service of Process and to Permit Alternative/Substituted Service of Process as to Defendant Ronald Rooding."  ECF 15 (the "Motion for Alternative Service").  In the Motion for Alternative Service, plaintiff requested a 120-day extension for service and permission to use alternative methods of service, including "posting the Summons and Complaint upon the door of Defendant's residence" and "sending the Summons and Complaint by both certified mail, return receipt requested, and by first class mail, to Defendant . . . ."  *Id*. ¶¶ 5a, 5b.  In support of the Motion for Alternative Service, plaintiff stated, *id*. at ¶ 2:

> Plaintiff's counsel initially attempted to serve the Defendant at 6705 German Hill Road, Dundalk, Maryland on September 9, 2015 and continued to make multiple attempts to serve the Defendant at this location as well as the location of the Defendant's boat the "Margaritaville" located at Deckelman's Boat Yard, 201 Oak Avenue, Essex, Maryland 21221.

Plaintiff further posited, *id*. at ¶ 4:

> Although Plaintiff has also attempted twice to serve Defendant Rooding by first class mail using the waiver procedure set forth in FRCP4(d), on each attempt the envelope was returned without any official Post Office sticker or seal, but with annotations closely resembling the handwriting of the Defendant . . . . The first envelope had been opened.

In support of the Motion for Alternative Service, National submitted an "Affidavit of Evasion Pursuant to Federal Rule 4, and Maryland Rule 2-121(c)" (ECF 15-1), signed by three process servers, describing their efforts to serve Rooding.  *Id.*  They averred that, collectively, they approached Rooding's home on German Hill Road in Dundalk, Maryland on four occasions

(*id.* ¶¶ 5, 11, 14, 15) and an attempt was also made to serve Rooding at the boatyard where the Vessel was docked.  *Id*. ¶¶ 6-9.

J. Matthews Manlich attempted to serve Rooding on September 12, 2015, but did not receive any response after knocking on Rooding's door.  *Id*. ¶ 5.  He noted that "the mailbox was overflowing with mail."  *Id*.  At that time, Manlich was "unable to determine if the Defendant resided at the address." *Id*.

Stephen  Folcher attempted to serve Rooding at his home on October 12, 2015.  *Id*. ¶ 11. Folcher did not receive a response, and a neighbor "stated that the Defendant had been in Chicago, but had recently returned."  *Id*.  According to Folcher, the neighbor observed that Rooding's "pickup truck was parked in front of her house."  *Id*.  It had Illinois tags.  *Id*.  As Folcher was leaving, he encountered a delivery person who had arrived with food, presumably for Rooding.  *Id*. ¶ 12.  Folcher stated that "[t]he delivery person waited several minutes and attempted to call the Defendant, but he did not answer."  *Id*.  Folcher then left a note on the door asking for Rooding to call him.  *Id*.

Folcher returned to Rooding's home on October 18, 2015, and noticed that the letter that he had previously posted had been removed.  *Id* ¶ 14.  Again, he received no response when he knocked on the door.  *Id*.  Folcher left another letter on the door, again asking Rooding to contact him.  *Id*.  Folcher noted that the pickup truck that had been described by the neighbor as belonging to Rooding was parked across the street.  *Id*.  Folcher returned to Rooding's home again on October 18, 2015, and observed that his letter had again been removed.  *Id*. ¶ 15. Folcher knocked on Rooding's door, but nobody answered.  *Id*.  Folcher left yet another letter asking Rooding to call him.  *Id*.

The process servers learned that Rooding had two active addresses – one where service was attempted and another in Antioch, Illinois.  *Id.* ¶ 17.  They could not locate a place of employment.  *Id.* ¶ 19.

Based on the information presented, I issued an Order on December 11, 2015 (ECF 16), granting a sixty-day extension for service and permission for alternative service, to include posting the summons and complaint on the defendant's door at the Dundalk address, and sending the summons and complaint by certified mail, receipt requested to that address.  *Id.*  Rooding was served by mail and by posting on January 13, 2016.  ECF 20; ECF 21.

On February 4, 2016, plaintiff submitted "Motion for Entry of Default of Defendant." ECF 22.  The Clerk entered an order of default on February 5, 2016.  ECF 23.

Defendant filed the Motion to Vacate on March 16, 2016 (ECF 25), seeking to Set aside the "Clerk's Entry of Default" and to allow him to respond to the Complaint.  *Id*. at 2.  The Motion to Vacate states: "Defendant was not present at the address where alternative service is said to have taken place during the periods in question. Debtor was either in Florida or Chicago, Illinois."  *Id*. ¶ 5.  Defendant also claims that although he was aware of the pending case, he was not represented when plaintiff attempted to effect service (*id*. ¶ 6) and "was not aware of any service until he approached Counsel about entering an appearance in his case . . . ."  *Id*. ¶ 7.  At that time, "Counsel examined the docket and saw the entry of default."  *Id*.

The next day, on March 17, 2016, plaintiff filed the Motion for Default Judgment (ECF 27), as well as a status report (ECF 28), which was requested by the Court on March 10, 2016. *See* ECF 24.  As noted, defendant never responded to the Motion for Default Judgment.

National later filed an Opposition to the Motion to Vacate.  ECF 29.  It includes more than a dozen exhibits.  *See* ECF 29-1 to ECF 29-17.  In support of its argument, plaintiff recites

the steps it took to serve defendant and insists that defendant "was evading service of process . . . ."  ECF 29 at 3.  National maintains that "intense efforts were made to serve Mr. Rooding with process.  Despite repeated visits to Mr. Rooding's house, the process server was unable to serve him."  *Id*. at 2.  Plaintiff asserts: "Although it was clear that Mr. Rooding was still living at 6706 German Hill Road in Dundalk, Maryland, as confirmed from neighbors, passersby and food delivery personnel, Mr. Rooding would not open the door for the process server."  *Id*.

National also retained an expert to examine the handwriting on the envelopes discussed above.  The expert's report is an exhibit to the Opposition.  *See* ECF 29-14.  The expert opined that "the evidence supports [her] opinion to a reasonable degree of scientific certainty that the handwriting that appears on the Questioned Documents labeled Q-1 and Q-2 [the two envelopes] were written by Ronald Rooding."  *Id*. at 2.

Rooding never replied to the Opposition.

## II.    Discussion

The entry of default and default judgments are governed by Fed. R. Civ. P. 55, which entails two distinct steps.  The first step is the Clerk's entry of default, which is governed by Fed. R. Civ. P. 55(a).  It provides: "When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default."  The second step is the entry of default judgment.  When, as here, the claim is not for a sum certain, "the party must apply to the court for a default judgment."  Fed. R. Civ. P. 55(b)(2).  Rule 55(c) is also pertinent.  It provides: "The court may set aside an entry of default for good cause . . . ."

Plaintiff filed its comprehensive Motion for Default Judgment one day after defendant moved to vacate the entry of plaintiff's default.  Apparently, counsel proceeded with that filing because he had completed all the work to draft the Motion for Default Judgment just before the Motion to Vacate was filed.  ECF 29 at 5; ECF 29-1 (Affidavit of Stephen White, Esq.), ¶ 10.  In other words, he had already expended the time to prepare the Motion for Default Judgment.

The effort expended by counsel for National is plainly evident from the quality of the submission.  Nevertheless, National's able counsel surely would have known that the Court of Appeals for the Fourth Circuit has long expressed a "strong policy that cases be decided on their merits."  *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 453 (4th Cir. 1993); *see also Tazco, Inc. v. Director, Office of Workers' Compensation Program*, 895 F.2d 949, 950 (4th Cir. 1990); *Herbert v. Saffell*, 877 F.2d 267, 269 (4th Cir. 1989).  Indeed, the Fourth Circuit has cautioned that because "dismissal without deciding the merits is the most extreme sanction, a court must . . . exercise its inherent power to dismiss with restraint . . . ."  *Shaffer Equipment*, 11 F.3d at 462. To that end, "'an extensive line of decisions' has held that Federal Rule of Civil Procedure 55(c) must be 'liberally construed in order to provide relief from the onerous consequences of defaults and default judgments.'"  *Lolatchy v. Arthur Murray, Inc.*, 816 F.2d 951, 954 (4th Cir. 1987) (quoting *Tolson v. Hodge*, 411 F.2d 123, 130 (4th Cir. 1969)).

To be sure, although there is a strong policy in favor of deciding cases on the merits, that policy is not absolute.  "[D]efault judgment 'is appropriate when the adversary process has been halted because of an essentially unresponsive party.'"  *Entrepreneur Media, Inc. v. JMD Entertainment Group, LLC*, 958 F.Supp.2d 588, 593 (D. Md. 2013) (quoting *S.E.C. v. Lawbaugh*, 359 F.Supp.2d 418, 421 (D. Md. 2005)).

The Fourth Circuit has articulated six factors for courts to review in deciding whether to set aside an entry of default. *See Colleton Preparatory Academy v. Hoover Universal, Inc.*, 616 F.3d 413, 417 (4th Cir. 2010); *see also Payne ex rel. Estate of Calzada v. Brake*, 439 F.3d 198, 203 (4th Cir. 2006); Fed.R.Civ.P. 55(c).  "[A] district court should consider whether the moving party has a meritorious defense, whether it acts with reasonable promptness, the personal responsibility of the defaulting party, the prejudice to the party, whether there is a history of dilatory action, and the availability of sanctions less drastic." *Colleton*, 616 F3d at 417 (quoting *Payne*, 439 F.3d at 204-05).  I turn to consider these factors.

### 1. Meritorious Defense

The first factor requires the court to consider whether the defendant has presented a "meritorious defense." *Colleton*, 616 F.3d at 417; *see also Wainwright's Vacations, LLC v. Pan American Airways Corp.*, 130 F.Supp.2d 712, 718 (D. Md. 2001).  "All that is necessary to establish the existence of a meritorious defense is a presentation or proffer of evidence, which, if believed, would permit the court to find for the defaulting party." *Armor v. Michelin Tire Corp.*, 113 F.3d 1231 at *2 (4th Cir. 1997); *see United States v. Moradi*, 673 F.2d 725, 727 (4th Cir. 1982).  "'The underlying concern is . . . whether there is some possibility that the outcome . . . after a full trial will be contrary to the result achieved by the default.'" *Augusta Fiberglass Coatings, Inc. v. Fodor Contracting Corp.*, 843 F.2d 808, 812 (4th Cir. 1988) (alterations in original) (quoting 10 Charles Allen Wright, Arthur R. Miller & Mary Kay Kane, <u>Fed. Prac. & Proc. Civ.</u> § 2697, at 531 (2d ed. 1983)).

National argues that defendant has not proffered a meritorious defense.  *See* ECF 29 at 6-9.  It asserts, *id.* at 7:

> Mr. Rooding failed to file any proposed Answer to the Complaint along with his Motion to Vacate Entry of Default. He has not raised any affirmative

defenses, and has failed to introduce any facts to support a position in opposition to the declaratory judgment sought by the Plaintiff, either by Affidavit or in a proposed Answer. The only indication given that he might have a defense is the statement in paragraph 12 of his Motion which reads "Defendant can and will posit good faith defenses to Plaintiff's Complaint." ECF 25.

Plaintiff is correct that defendant has failed to articulate a meritorious defense in the Motion to Vacate. Indeed, he does little more than state the conclusory position that he "can and will posit good faith defenses to Plaintiff's Complaint." ECF 25 ¶ 12. On the other hand, this deficiency may rest with defense counsel. And, it may be that defense counsel hurriedly filed the motion to vacate to avoid further delay, wtihout adequate time to investigate. *See* ECF 25 ¶ 7 (stating that defense counsel examined the docket and saw the default).

### 2. Reasonable Promptness

"'[A] party attempting to set aside an entry of default must act with reasonable promptness in responding to the entry of default . . . .'" *Wainwright's Vacations, LLC*, 130 F. Supp. 2d at 718 (internal citations omitted). Because Rule 55(c) does not provide a specific time frame for filing a motion to vacate, this question must be viewed "in light of the facts and circumstances of each occasion." *Moradi*, 673 F.2d at 727.

The Clerk entered the default on February 5, 2016. ECF 23. The Motion to Vacate followed on March 16, 2016 (ECF 25), before the Motion for Default Judgment was filed. ECF 27. Defendant asserts: "Defendant was not aware of any service until he approached Counsel about entering an appearance in his case, as Defendant was unaware of any activity in the case. Counsel examined the docket and saw the entry of default." ECF 25 ¶ 7. *See* ECF 27.

In my view, the Motion to Vacate was filed with reasonable promptness, about five weeks after the entry of default.

### 3.   Personal Responsibility and History of Dilatory Action

The third factor pertains to whether the defaulting party was personally responsible for the default and the fifth factor considers whether there is a "history of dilatory action." *Colleton*, 616 F.3d at 417.

Defendant states, without an affidavit, that he was not present at his home, where alternative service was effected, because he was "either in Florida or Chicago, Illinois." ECF 25 at ¶ 5.   Furthermore, defendant submits that he "was aware of a pending case as Counsel had been notified, but at that time Counsel had ended his representation of the Defendant . . . ." *Id*. ¶ 6.   Given these circumstances, Rooding argues that he "was not aware of any service until he approached Counsel about entering an appearance in his case . . . ." *Id*. ¶ 7.

Plaintiff counters: "Mr. Rooding has failed to provide any dates of his alleged trips to Florida or Chicago; and has failed to file documentation of his trips (e.g., plane tickets or hotel receipts)." ECF 29 at 10.   Moreover, plaintiff relies on the opinion of a handwriting expert, who compared the handwriting on the envelopes containing the returned summons and complaints with prior known writings of the defendant.   ECF 29-14.   The expert opines "to a reasonable degree of scientific certainty that the handwriting that appears on the Questioned Documents . . . were [sic] written by Ronald Rooding." ECF 29-14 at 2.

National also argues: "It is obvious that Mr. Rooding was aware of the present action against him; knew that process would be served upon him; knew that Plaintiff's process server was attempting to serve him; and that he deliberately acted to evade service of process." ECF 29 at 10.   Plaintiff complains, *id.*, that Rooding

> has failed to give any explanation as to why he failed to see or take heed of the large packet containing the Summons and Complaint that the process server taped to his front door on December 19, 2015; why he "ducked" service by the process server; why he failed to respond to the first class mail sent to him on January 13,

2016; or why he failed to pick up the certified mail that was sent to him by the process server the same date (which was returned to the process server unclaimed on February 5, 2016).

I approved alternative service because I was persuaded by National that it was justified. Nevertheless, there is some indication that Rooding also had an address in Illinois.  In any event, there was a relatively brief delay at the outset of this litigation based on Rooding's conduct, but I am unaware of a history of dilatory action by Rooding.

Moreover, the most significant delay is attributable to the one that ensued due to the time it took for this Court to address the motions.  On the other hand, some delay was to be expected, as it is not unusual with respect to the resolution of contested motions.

### 4.  Prejudice to Non-Defaulting Party

The fourth factor pertains to the prejudice that the non-defaulting party will suffer.  *See Colleton*, 616 F.3d at 417.  Plaintiff offers several grounds to support its claim of prejudice.  *See* ECF 29 at 11-13.

Plaintiff claims prejudice in the expenses it incurred attempting to serve defendant and to prepare the Motion for Default Judgment, as well as the delay in litigation.  *Id.*  National asserts, *id*. at 11:

> Mr. Rooding's evasion of service of process and his dilatory actions in responding to the Complaint have caused prejudice to the Plaintiff, which has incurred substantial attorneys' fees and expenses in pursuing and obtaining service of process upon Mr. Rooding, in preparing the Motion for Extension of Time to Serve Process and for Alternative Service of Process; in preparing the Motion for Entry of Default; and for preparing the Motion for Entry of Default Judgment (this Motion had been fully drafted and was ready to be filed at the time Mr. Rooding filed his Motion to Vacate Entry of Default).

*See also*, *e.g.*, ECF 29-1.

Plaintiff also states, *id.*: "It may have been Mr. Rooding's plan all along to cause Plaintiff as much trouble and expense as possible and in that regard, he has succeeded."  Additionally,

plaintiff notes: "The delay that Mr. Rooding has caused by evading service of process has already extended storage of the Vessel by five months."  ECF 29 at 12.

In addition, plaintiff claims that it will suffer prejudice if the Motion to Vacate is granted because "[t]he delays caused solely by Mr. Rooding's evasion may already have resulted in the loss or spoliation of valuable evidence that may have been important to the Plaintiff's position." *Id.*  Plaintiff submits, *id.* at 12-13:

> The boat has remained outdoors, unprotected and uncovered. Had Mr. Rooding not evaded service and promptly answered the Complaint, raising and describing his defenses last Fall, the boat could have been reinspected before so much additional time had passed. Now that the boat has remained exposed to the elements over the winter and for an additional six months, valuable evidence could have already been lost or spoiled, much to the prejudice of the Plaintiff.

It is clear that plaintiff has expended a considerable amount of time and resources in attempting to serve the defendant and in litigating these motions.  But, at least with respect to its Motion for Default Judgment and its Opposition to the Motion to Vacate, the Fourth Circuit has long expressed a strong preference for litigation of cases on the merits.  And, at the relevant time, the case had only been pending for a few months.  Therefore, it is difficult to find any serious prejudice to National from the delay attributable to Rooding.  Indeed, as I have said, much of the delay comes from this Court's inability to have reached these motions in a more timely fashion, due to the press of other cases.

Moreover, plaintiff does not explain why it could not have taken steps to prevent any spoliation of evidence, given that it is currently responsible for storage of the Vessel.  *See* ECF 29 at 12-13.  Nor does it explain why the Vessel could not have been reinspected.

### 5.  Availability of Alternative Sanctions

The Court must also consider whether there are less drastic sanctions available to cure any prejudice.  *Colleton*, 616 F.3d at 417.  According to plaintiff, "The only sanction less drastic

to a refusal to vacate the entry of default would be to award Plaintiff its attorneys [sic] fees and costs incurred in 'chasing' Mr. Rooding since last October and in opposing the present Motion." ECF 29 at 13.  Nevertheless, plaintiff argues, *id*. at 14:

> While such a sanction may be available, and may be considered when construing the sixth element of the test, and while it could possibly be considered as less onerous than refusing to vacate the entry of default, under the circumstances of the present case, Plaintiff submits that justice requires the denial of the Motion to Vacate and that exercising the Court's discretion to deny the Motion to Vacate the Entry of Default, would be the correct, logical, and justifiable alternative under the facts and circumstances of the present case.

Wright and Miller provide helpful guidance on this issue.  *See* 10A Charles A. Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 2700 (4th ed. 2016):

> The most common type of prejudice is the additional expense caused by the delay, the hearing on the Rule 55(c) motion, and the introduction of new issues. These burdens can be eased by requiring the defaulting party to provide a bond to secure costs, to pay court costs, or to cover the expenses of an appeal.  Imaginative and flexible use of the power to impose conditions on the granting of relief under Rule 55(c) can serve to promote the positive purposes of the default procedures without subjecting either litigant to their drastic consequences.

Where appropriate, courts in this circuit have crafted alternative sanctions to avoid default.  For example, in *Lolatchy*, 816 F.2d at 953, the Fourth Circuit determined that a default judgment was inappropriate because "[t]he attorney, for example, could have been charged with all costs and expenses attendant to the delay, including attorneys' fees, or even held in contempt of court."

Less drastic sanctions are available to National.  It may file a motion seeking reasonable legal fees and costs.  However, it must support its request with appropriate explanation and documentation, consistent with the practice in the District of Maryland and elsewhere.

### III.    Conclusion

Given the facts and circumstances that have been presented here, coupled with the Fourth Circuit's strong policy in favor of deciding cases on the merits, I shall grant the Motion to Vacate and deny the Motion for Default Judgment.

An Order follows.


Date:  September 21, 2016                                 _____/s/_____
                                                                              Ellen L. Hollander
                                                                              United States District Judge