IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

NATIONAL LIABILITY & FIRE
INSURANCE COMPANY,

*Plaintiff,*

v.

RONALD ROODING,

*Defendant.*

Civil Action No.: ELH-15-2572

## MEMORANDUM OPINION

National Liability & Fire Insurance Company ("National"), plaintiff, filed suit against

defendant Ronald Rooding on August 31, 2015, seeking a declaratory judgment as to its

obligations under two marine insurance policies that National had issued to Rooding.  ECF 1.[1]

In particular, National seeks a declaration that it is not obligated to provide coverage to Rooding

with respect his claim for damages, arising out of the loss of the vessel MARGARITAVILLE

(the "Vessel").  Rooding reported the loss on May 1, 2015.  But, according to National, the

Vessel sank prior to that date, when the policies were not in effect.  ECF 1.  Further, National

seeks a declaration that the policies are "null and void *ab initio*," on the grounds that Rooding

breached the implied warranty of seaworthiness; breached the duty established by the doctrine of

*uberrimae fidei*; and/or because Rooding breached the terms of the "Fraud and Concealment"

clause of the policies  *Id.*

---

[1] An Amended Complaint was filed on November 10, 2015, to correct the address of
defendant.  ECF 11.

Now pending is National's "Motion for Attorneys' Fees and Costs" (ECF 35), supported by a Memorandum of Law (ECF 35-1, collectively, "Motion for Fees"). In the Motion for Fees, filed pursuant to Fed. R. Civ. P. 4(d)(2), National seeks to recover $2,690 in attorney's fees and costs, incurred, *inter alia*, in attempting to serve Rooding with the suit. National submitted several exhibits with its Motion for Fees. *See* ECF 35-2 through ECF 35-8. Rooding requested additional time to respond to the Motion for Fees (ECF 41), which I granted by Order of November 2, 2016. ECF 42. Despite the extension, Rooding did not respond to the Motion for Fees and the time to do so has expired. *See* Local Rule 105.2; ECF 42.

In addition, National has filed a "Second Motion for Entry of Default Judgment." ECF 36. It is supported by a Memorandum of Law (ECF 36-1) (collectively, "Motion" or "Motion for Default") and two exhibits. ECF 36-2 and ECF 36-3. Rooding has not responded to the Motion for Default and the time to do so has expired. *See* Local Rule 105.2.

No hearing is necessary to resolve the motions. *See* Local Rule 105.6. For the reasons that follow, I shall grant the Motion for Default. Furthermore, I shall grant the Motion for Fees, but in an amount to be determined after further submissions from National.

## I.    Factual and Procedural Background[2]

On or about August 16, 2014, Rooding purchased the Vessel from Jack Franklin for the sum of $9,515.00. ECF 1 ¶ 9. The Vessel was a 30-foot 1978 Trojan yacht. *Id*. ¶ 4. However, Rooding did not obtain a Certificate of Title to the vessel from the Maryland Department of Natural Resources until April 29, 2015. *Id.* ¶ 9. Rooding allegedly represented on his Application for Title that he had paid $3,500 for the Vessel. *Id.* Rooding kept the Vessel in a

---

[2] The facts are drawn from the Complaint. They are uncontested.

slip located at River Watch Marina in Middle River, Maryland, on a tributary of the Chesapeake Bay. *Id.* ¶ 10.

Rooding endeavored to procure insurance for the Vessel on or about August 15, 2014, and contacted National's underwriting agent. *Id.* ¶ 11. According to plaintiff, Rooding was told that the Vessel could be insured only for Rooding's "financial investment" in the Vessel. *Id.* However, Rooding allegedly sought coverage of $25,000 on the hull. *Id.* On August 16, 2014, National issued Policy No. 3792430-14 (ECF 1-2, the "First Policy"), with the effective date of August 16, 2014 through August 16, 2015. *Id.* It provided hull liability coverage of $25,000. *Id.*; *see* ECF 1-2.[3]

National asserts, *id.* ¶ 12:

> The cover letter enclosing the First Policy informed Rooding that to maintain the coverage, Rooding needed to provide: (1) an acceptable condition and value marine survey; (2) a copy of the "sales agreement" for the Vessel; and (3) a completed and signed Marine Insurance Application. The Marine Insurance Application provided to Rooding contained certain pre-filled information, including an entry of "$25,000" as the "Boat Purchase Price." Rooding never signed or returned the Application or the Bill of Sale. He also did not send a survey to the underwriter until many months later.

National alleges that a marine survey of the Vessel was conducted in late August or early September of 2014. It indicated that a valve leading to the intake hoses for the head and "wash down system" was "missing a required dedicated handle to open and close the valve." *Id.* ¶ 13. And, the "hull valve (or seacock) with the missing handle was later determined to have been stuck in the open position" when the First Policy was issued, "unknown and unreported" to National. *Id.* ¶ 14. As a result, National contends that, when the First Policy was issued on August 16, 2014, the Vessel was "defective and unseaworthy." *Id.*

---

[3] According to National, its agent, BoatUS, is also a party to the contract. BoatUS services boat and yacht insurance. ECF 1 ¶ 3.

On December 4, 2014, the First Policy was terminated for non-payment of the premium. *Id.* ¶ 16.  Rooding requested another insurance policy from National on January 22, 2015.  *Id.* ¶ 18.  On January 26, 2015, National "determined that the Vessel could be insured under a no navigation ('port risk') policy, so long as Rooding removed a 110 volt electrical outlet from the aft cockpit compartment. . . .", because that was considered "a safety hazard . . . ."  *Id.*  On January 23, 2015, National sent Rooding an insurance application, which reflected a "Boat Purchase Price of $25,000."  *Id.* ¶ 19.  Rooding signed and submitted the application.  *Id.*

The outlet was removed on or about April 3, 2015.  ECF 1 ¶ 20.  Thereafter, National issued Policy No. 3842216-15.  ECF 1-3 ("Second Policy").  It insured the vessel on a "'no navigation' basis" from March 31, 2015 to March 31, 2016.  ECF 1 ¶ 21.

Rooding executed another version of the Marine Insurance Application form for the Second Policy, dated April 8, 2015.  ECF 1 ¶ 22.  "On this version of the form, Rooding removed the $25,000 figure placed on the 'Boat Purchase Price' subject line, and left the line blank."  *Id.*  According to National, it subsequently increased Rooding's Hull insurance to $26,500, based on representations by Rooding as to the installation of equipment on the Vessel. *Id.* ¶ 23.  It also provided coverage of $6,200 for Rooding's personal effects.  *Id.*

On May 1, 2015, in Claim No. 1502226, Rooding notified plaintiff that the Vessel had sustained "significant water damage due to a sinking incident of an unknown cause that occurred on an unknown date."  *Id.* ¶ 24.  However, Rooding was unable to offer plaintiff an explanation of how or when the Vessel sank.  *Id.* ¶ 25.  Moreover, he did not provide the actual date of the occurrence.

National retained an expert marine surveyor, Michael J. McCook, to inspect the Vessel. *Id.* ¶¶ 27-28.  McCook "concluded to a reasonable degree of certainty [that] the [V]essel sank

after the first freeze in the Middle River area . . . after January 1, 2015 . . . and prior to March, 2015," because of "ice breaking the sea strainer serving the head." ECF 1 ¶ 31. McCook explained: "When the ice broke the strainer, due to the open valve (seacock) on the supply hose, water entered the Vessel, overwhelmed the bilge pumps and the Vessel ultimately sank." *Id.* McCook opined, *id.*: "There is no evidence to support any other reasonable cause of the sinking."

Thus, National's investigation revealed defects in the Vessel that, in National's view, rendered the Vessel defective and unseaworthy before either policy was issued. National asserts, based on McCook's investigation, *id.* ¶ 31: "Had the boat been properly winterized, the failure would not have occurred." National also asserts, *id.* at ¶ 34:

> After performing the investigation referred to above, National Liability determined that there was no coverage available to Rooding under the Policies for the reasons set forth in the claim denial letter dated August 5, 2015, which is attached hereto as Exhibit C [ECF 1-4] and incorporated herein by reference. In sum, coverage was not extended for Rooding's claim because Rooding could not establish that the reported sinking occurred during the periods that the Policies were in force, or on or between August 16, 2014 and December 4, 2014 or on or between March 31, 2015 and the date the loss was reported, May 1, 2015.

On August 27, 2015, National sent Rooding a letter denying his claim. ECF 1-5. National advised that the Policies were void *ab initio* because, in National's view, Rooding had (1) breached the implied warranty of seaworthiness; (2) breached the doctrine of *uberrimae fidei*; and (3) breached the "Fraud and Concealment" clause of the Policies. *Id.* Notably, the letter also stated that the "Date of Loss" was "Undetermined." *Id.*[4]

National contends that Rooding "violated his duty to National Liability by misrepresenting material facts and by omitting material facts." *Id*. ¶ 45. In particular, plaintiff contends that defendant misrepresented the purchase price of the vessel as $25,000 when the

---

[4] In addition, the letter stated that National was returning $540.40 to Rooding, "representing a return of the premium paid on both of the" Policies. *Id.*

actual purchase price "was $9,515.00 or $3,500." *Id.* ¶¶ 45a, 45b. Plaintiff also asserts that defendant failed "to disclose unseaworthy conditions aboard the Vessel prior to the inception of coverage on August 17, 2014 and again prior to the inception of coverage on March 31, 2015." *Id.* ¶ 45g. According to plaintiff, there is no coverage under the policies because "the Insured [] failed to indicate or rely upon any cause for the sinking and cannot demonstrate that the claimed loss occurred during the effective policy dates." *Id.* ¶ 49.

On September 1, 2015, the Clerk issued a summons for service of the suit on defendant. ECF 5. On October 28, 2015, pursuant to Rule 4(d), National sent a "'Request for the Waiver of Service of Summons' along with all required enclosures and notifications, to Defendant, Ronald Rooding, by first class mail, postage prepaid." ECF 10. Then, on November 10, 2015, plaintiff filed an amended complaint, correcting the zip code for defendant. ECF 11. On the same date, plaintiff sent a second "Request for the Waiver of Service of Summons" to defendant, using the corrected zip code. ECF 13. Thereafter, on November 13, 2015, the Clerk issued a new summons. ECF 14.

According to National, both attempts to serve Rooding by mail under Fed. R. Civ. P. 4(d) were unsuccessful. ECF 35-1 at 3-4; ECF 15-1 at 14-15 (facsimile of returned envelopes). National submits that its first envelope was returned to it on November 9, 2016 [sic]. ECF 35-1 at 3. It states, *id.*: "On the outside of the envelope, in black ink, the zip code was changed to 21222 (from 21224) and in red ink someone had drawn X's through the address and had written 'Return to sender' and 'Unknown' on the envelope." *See id.* at 3; ECF 35-2 ¶ 5 (Affidavit of Stephen F. White, Esquire). According to White, the envelope had been opened, although the contents were still inside. ECF 35-2 ¶ 5. Furthermore, National asserts that the other envelope

was returned on November 17, 2015, with handwriting on the envelope that said: "Unkown [sic] return to sender."  ECF 35-1 at 4; *see* ECF 35-2 ¶ 6.

On December 11, 2015, plaintiff filed a "Motion for Order Extending Time for Service of Process and to Permit Alternative/Substituted Service of Process as to Defendant Ronald Rooding."  ECF 15 (the "Motion for Alternative Service").  In support of the Motion for Alternative Service, National submitted an "Affidavit of Evasion Pursuant to Federal Rule 4, and Maryland Rule 2-121(c)" (ECF 15-1), signed by three process servers, describing their futile efforts to serve Rooding.  *Id.*

In the Motion for Alternative Service, plaintiff requested a 120-day extension for service and permission to use alternative methods of service, including "posting the Summons and Complaint upon the door of Defendant's residence" and "sending the Summons and Complaint by both certified mail, return receipt requested, and by first class mail, to Defendant . . . ."  *Id.* ¶¶ 5a, 5b.  Plaintiff stated, *id.* at ¶ 2:

> Plaintiff's counsel initially attempted to serve the Defendant at [] German Hill Road, Dundalk, Maryland on September 9, 2015 and continued to make multiple attempts to serve the Defendant at this location as well as the location of the Defendant's boat the "Margaritaville" located at Deckelman's Boat Yard, 201 Oak Avenue, Essex, Maryland 21221.

Further, plaintiff posited, *id.* at ¶ 4:

> Although Plaintiff has also attempted twice to serve Defendant Rooding by first class mail using the waiver procedure set forth in FRCP4(d), on each attempt the envelope was returned without any official Post Office sticker or seal, but with annotations closely resembling the handwriting of the Defendant . . . . The first envelope had been opened.

In the Affidavit (ECF 15-1), the process servers averred that they approached Rooding's home on German Hill Road in Dundalk, Maryland on four occasions.  *Id.* ¶¶ 5, 11, 14, 15.  In

addition, an attempt was made to serve Rooding at the boatyard where the Vessel was docked. *Id*. ¶¶ 6-9.

To illustrate, J. Matthews Manlich claimed that he attempted to serve Rooding on September 12, 2015, but did not receive any response after knocking on Rooding's door. *Id*. ¶ 5. He noted that "the mailbox was overflowing with mail." *Id*. At that time, Manlich was "unable to determine if the Defendant resided at the address." *Id*.

Stephen Folcher attempted to serve Rooding at his home on October 12, 2015. *Id*. ¶ 11. Folcher did not receive a response but, a neighbor "stated that the Defendant had been in Chicago, but had recently returned." *Id*. According to Folcher, the neighbor observed that Rooding's "pickup truck was parked in front of her house," with Illinois tags. *Id*. As Folcher was leaving, he encountered a delivery person who had arrived with food, presumably for Rooding. *Id*. ¶ 12. Folcher stated: "The delivery person waited several minutes and attempted to call the Defendant, but he did not answer." *Id*. Folcher left a note on the door asking for Rooding to call him. *Id*. Rooding did not call. *Id*. ¶ 13.

Folcher returned to Rooding's home on October 18, 2015, and noticed that the letter that he had previously posted was not on the door. *Id* ¶ 14. Folcher noted that the pickup truck that had been described by the neighbor as belonging to Rooding was parked across the street. *Id*. But, he received no response when he knocked on the door. *Id*. Folcher left a letter on the door, again asking Rooding to contact him. *Id*. Folcher returned to Rooding's home later on October 18, 2015, and observed that his letter was not on the door. *Id*. ¶ 15. Folcher knocked on Rooding's door, but nobody answered. *Id*. Folcher left yet another letter asking Rooding to call him. *Id*. Rooding did not call. *Id*. ¶¶ 13, 20.

The process servers learned that Rooding had two active addresses – one where service was attempted and another in Antioch, Illinois.  *Id.* ¶ 17.  However, they could not locate Rooding's place of employment.  *Id.* ¶ 19.

On December 11, 2015, I issued an Order granting a sixty-day extension for service and permission for alternative service, to include posting the summons and complaint on the defendant's door at the Dundalk address, and mailing the summons and complaint by first class mail and by certified mail, return receipt requested, to that address.  ECF 16.  Rooding was served by posting on December 19, 2015 (ECF 20) and by both first class and certified mail on January 13, 2016.  ECF 21.

On February 4, 2016, plaintiff submitted "Motion for Entry of Default of Defendant." ECF 22.  The Clerk entered an order of default on February 5, 2016.  ECF 23.

Then, on March 16, 2016, through counsel, defendant filed a skeletal Motion to Vacate Default Judgment (ECF 25, "Motion to Vacate"), seeking to set aside the Clerk's "Entry of Default" and to "Allow Defendant to Respond to the Complaint."  *Id.* at 2.  The Motion to Vacate stated: "Defendant was not present at the address where alternative service is said to have taken place during the periods in question. Debtor [sic] was either in Florida or Chicago, Illinois."  *Id*. ¶ 5.  Defendant also explained that although he was aware of the pending case, he was not represented by counsel when plaintiff attempted to effect service (*id*. ¶ 6) and "was not aware of any service until he approached Counsel about entering an appearance in his case . . . ." *Id*. ¶ 7.  At that time, "Counsel examined the docket and saw the entry of default."  *Id*.  Notably, defendant stated: "Defendant can and will posit good faith defenses to Plaintiff's Complaint." *Id*. ¶12.  And, defendant stated that he "will accept service through counsel."  *Id.* ¶ 8.

The next day, March 17, 2016, plaintiff filed a Motion for Default Judgment ( ECF 27), supported by exhibits. *See* ECF 27-2 and ECF 27-3. Curiously, plaintiff never responded to the Motion for Default Judgment. *See* docket. And, on April 1, 2016, National filed an opposition to the Motion to Vacate. ECF 29.

By Memorandum and Order of September 21, 2016 (ECF 31; ECF 32), I granted the Motion to Vacate and denied the Motion for Entry of Default Judgment. My ruling was predicated largely on the strong interest of courts in deciding cases on the merits. In my Order, I directed Rooding to respond to the suit by October 7, 2016, and allowed National until October 14, 2016, to submit a Motion for Attorneys' Fees and Costs. ECF 32.

Rooding never responded to the Complaint. *See* docket. On October 11, 2016, National docketed its "Second Motion for Entry of Default of Defendant." ECF 33. The Clerk entered default on October 13, 2016. ECF 34. Thereafter, National submitted its Motion for Fees (ECF 35) and its Motion for Default. ECF 36. Rooding did not respond to either motion.

## II.    Motion for Default Judgment

### A.  Standard of Review

Fed. R. Civ. P. 55(b) governs default judgments. Rule 55(b)(1) provides that where the plaintiff's claim is for a "sum certain or a sum that can be made certain by computation," the Clerk must enter judgment for that amount. Rule 55(b)(2) provides: "In all other cases, the party must apply to the court . . . . If the party against whom a default judgment is sought has appeared personally or by a representative, that party or its representative must be served with written notice of the application at least 7 days before the hearing."[5]

---

[5] National has met the service requirements of Rule 55(d)(2) by filing its Motion for Default by way of the CM/ECF system. *See* Local Rule 102.2(c) ("If a document is filed electronically, the notice of electronic filing constitutes a certificate of service as to all parties to

To be sure, the United States Court of Appeals for the Fourth Circuit has a "strong policy that cases be decided on the merits."  *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 453 (4th Cir. 1993); *see Tazco, Inc. v. Director, Office of Workers' Compensation Program,* 895 F. 2d 949, 950 (4th Cir. 1990); *Disney Enters. v. Delane*, 446 F. Supp. 2d 402, 405 (D. Md. 2006). But, that policy is not absolute.  Default judgment "'is appropriate when the "adversary process has been halted because of an essentially unresponsive party.'"  *Entrepreneur Media, Inc. v. JMD Entertainment Group, LLC*, 958 F. Supp. 2d 588, 593 (D. Md. 2013) (quoting *SEC v. Lawbaugh*, 359 F. Supp. 2d 418, 421 (D. Md. 2005)).

As noted, defendant did not respond to the suit.  Therefore, all of plaintiff's factual allegations, other than those pertaining to damages, are deemed admitted.  *See* Fed. R. Civ. P. 8(b)(6); *see also Ryan v. Homecomings Fin. Network*, 253 F.3d 778, 780 (4th Cir. 2001) (stating that the court accepts as true the well pleaded factual allegations in the Complaint as to liability). But, the court must determine whether the undisputed factual allegations constitute a legitimate cause of action.  *Id.* at 780-81; *see also* 10A C. Wright and A. Miller, FEDERAL PRACTICE AND PROCEDURE § 2688.1 (4th ed.) ("Wright and Miller") ("[L]iability is not deemed established simply because of the default . . . [and] the court, in its discretion, may require some proof of the facts that must be established in order to determine liability.[]").

Here, plaintiff seeks declaratory relief, as opposed to monetary damages.  And, "default judgment is appropriate if the well-pleaded allegations of the complaint establish the plaintiff's right to such relief."  *Nautilus Ins. Co. v. REMAC Am., Inc.*, 956 F. Supp. 2d 674, 679 (D. Md. 2013) (Chasanow, J.) (citing, *inter alia*, *Nautilus Ins. Co. v. BSA Ltd. P'ship*, 602 F. Supp. 2d 641, 645-46 (D. Md. 2009)).

---

whom electronic notice is sent.").  The CM/ECF receipt for ECF 36 indicates that notice was sent to Mr. Rooding's counsel.  *See* docket.

## B.  Discussion

National seeks a declaration from the Court that "the Policies of insurance were null and void at their inception (void *ab initio*) . . ." and that "the Policies of insurance do not provide coverage for the claim asserted by Defendant Rooding."  ECF 1 at 19.  Accepting as true the facts alleged in the Complaint, National has established its right to the declaratory relief that it seeks.

### 1.  Coverage for Rooding's Claim

National claims that there is no coverage for Rooding's insurance claim (no. 1502226) because Rooding did not provide any evidence that the sinking occurred while an insurance policy was in effect.  As an initial matter, I note that there can be no dispute that the policies are subject to federal admiralty jurisdiction.  *See United States v. Tug Marine Venture*, 101 F. Supp. 2d 378, 381 (D. Md. 2000).

The Supreme Court's decision in *Wilburn Boat Co v. Fireman's Fund Ins. Co.*, 348 U.S. 310 (1955), governs the applicable law for interpreting marine insurance policies.  There, the Court determined that state law applies unless (1) a federal statute speaks to the question or (2) there is an applicable judicially-created admiralty rule.  *Id.* at 313-14.  The Supreme Court said, *id.* at 314: "Congress has not taken over the regulation of marine insurance contracts and has not dealt with the effect of marine insurance warranties at all; hence there is no possible question here of conflict between state law and any federal statute."  *See also Byrd v. Byrd*, 657 F.2d 615, 617 (4th Cir. 1981).

To my knowledge, there is no specific and controlling federal rule.  And, "the interpretation of a contract of marine insurance is–in the absence of a specific and controlling federal rule–to be determined by reference to appropriate state law."  *Ingersoll-Rand Fin. Corp.*

*v. Employers Ins. of Wausau*, 771 F.2d 910, 912 (5th Cir. 1985) (citing *Wilburn Boat*, 348 U.S. at 312-16).   Therefore, the First Policy and the Second Policy must be interpreted in accordance with Maryland law.

Maryland law is well settled that "the interpretation of an insurance policy is governed by the same principles generally applicable to the construction of other contracts." *Mitchell v. AARP*, 140 Md. App. 102, 116, 779 A.2d 1061, 1069 (2001); *see Moscarillo v. Prof'l Risk Mgmt. Servs., Inc.*, 398 Md. 529, 540, 921 A.2d 245, 251 (2007); *State Farm Mut. Ins. Co. v. DeHaan*, 393 Md. 163, 193, 900 A.2d 208, 225-26 (2006); *Cole v. State Farm Mut. Ins. Co.*, 359 Md. 298, 305, 753 A.2d 533, 537 (2000).   Accordingly, "'ordinary principles of contract interpretation apply.'"  *Megonnell v. United Servs. Automobile Ass'n*, 368 Md. 633, 655, 796 A.2d 758, 772 (2002) (citation omitted); *see Dutta v. State Farm Ins. Co.,* 363 Md. 540, 556, 769 A.2d 948, 957 (2001).

In "'deciding the issue of coverage under an insurance policy, the primary principle of construction is to apply the terms of the insurance contract itself.'"  *Universal Underwriters Ins. Co. v. Lowe*, 135 Md. App. 122, 137, 761 A.2d 997, 1005 (2000) (quoting *Bausch & Lomb, Inc. v. Utica Mut. Ins. Co.*, 330 Md. 758, 779, 625 A.2d 1021 (1993)).   However, the court bears responsibility for ascertaining the scope and limitations of an insurance policy.  *See Fister v. Allstate Life Ins. Co.*, 366 Md. 201, 210, 783 A.2d 194, 199 (2001); *Lloyd E. Mitchell, Inc. v. Maryland Casualty Co., Inc.*, 324 Md. 44, 56, 595 A.2d 469, 475 (1991).

The Maryland Court of Appeals has explained that judicial "interpretation of insurance contracts to determine the scope and limitations of the insurance coverage, like any other contract, begins with the language employed by the parties." *MAMSI Life & Health Ins. Co. v. Callaway*, 375 Md. 261, 279, 825 A.2d 995, 1005 (2003).  Generally, Maryland courts "analyze

the plain language of [an insurance] contract according to the words and phrases in their ordinary and accepted meanings as defined by what a reasonably prudent lay person would understand them to mean." *Universal Underwriters Ins. Co.*, 135 Md. App. at 137, 761 A.2d at 1005; *see Capital City Real Estate, LLC v. Certain Underwriters at Lloyd's London*, 788 F.3d 375, 379 (4th Cir. 2015) (quoting *Kendall v. Nationwide Ins. Co.*, 348 Md. 157, 166, 702 A.2d 767, 771 (1997)); *Walk v. Hartford Cas. Ins. Co.*, 382 Md. 1, 14-15, 852 A.2d 98, 106 (2004); *Litz v. State Farm*, 346 Md. 217, 224, 695 A.2d 566, 569 (1997).

"If the policy's language is clear and unambiguous, the Court will assume the parties meant what they said." *Capital City*, 788 F.3d at 379 (quoting *Perini/Tompkins Joint Venture v. Ace Am. Ins. Co.*, 738 F.3d 95, 101 (4th Cir. 2013)). "'Unless there is an indication that the parties intended to use words in the policy in a technical sense, they must be accorded their customary, ordinary, and accepted meaning.'" *Maryland Cas. Co. v. Blackstone Intern. Ltd.*, 442 Md. 685, 695, 114 A.3d 676, 681 (2015) (quoting *Lloyd E. Mitchell, Inc.*, 324 Md. at 56, 595 A.2d at 475). However, if there is evidence that the parties intended to ascribe a special or technical meaning to certain words used in an insurance contract, those words are construed in accordance with that understanding. *Valliere v. Allstate Insurance Co.*, 324 Md. 139, 142, 596 A.2d 636, 638 (1991) ("When a policy defines a term in a manner which differs from the ordinary understanding of that term, the policy definition controls."); *see also Walk*, 382 Md. at 14-15, 852 A.2d at 106; *Dutta*, 363 Md. at 556, 769 A.2d at 957.

If the court deems the provisions of an insurance policy unambiguous, the meaning of the terms is determined by the court as a matter of law. *Clendenin Bros. Inc. v. United States Fire Ins. Co*, 390 Md. 449, 459, 889 A.2d 387, 393 (2006); *see Pa. Nat. Mut. Cas. Ins. Co. v. Roberts*, 668 F.3d 106, 118 (4th Cir. 2012) (applying Maryland law). In that circumstance, "'a court has

no alternative but to enforce those terms.'" *Megonnell*, 368 Md. at 655, 796 A.2d at 772 (quoting *Dutta,* 363 Md. at 557, 556 A.2d at 1138).  But, if a contractual term is ambiguous, the court may consult "extrinsic sources" to ascertain the meaning.  *Cole*, 359 Md. at 305, 753 A.2d at 537.  A policy term is considered "ambiguous if, to a reasonably prudent person, the term is susceptible to more than one meaning."  *Id.* at 306, 753 A.2d at 537.

"'[U]nlike the majority of other states, Maryland does not follow the rule that insurance policies are to be most strongly construed against the insurer.'"  *Capital City*, 788 F.3d at 379 (quoting *Empire Fire & Marine Ins. Co. v. Liberty Mut. Ins. Co.*, 117 Md. App. 72, 97, 699 A.2d 482, 494 (1997)); *see Megonnell*, 368 Md. at 655, 796 A.2d at 771; *Bushey v. Northern Assurance Co. of America*, 362 Md. 626, 632, 766 A.2d 598, 601 (2001); *Collier v. MD-Individual Practice Ass'n*, 327 Md. 1, 5, 607 A.2d 537, 539 (1992).  But, "if ambiguity is determined to remain after consideration of extrinsic evidence, 'it will ordinarily be resolved against the party who drafted the contract,' where no material evidentiary factual dispute exists." *Clendenin Bros.*, 390 Md. at 459-60, 889 A.2d at 394; *see Callaway*, 375 Md. at 280, 825 A.2d 995, 1005-06 ("[W]hen a term in an insurance policy is found to be ambiguous, the court will construe that term against the drafter of the contract which is usually the insurer.").  In other words, where ambiguous language remains, the court "construe[s] that language 'liberally in favor of the insured and against the insurer *as drafter of the instrument.*'"  *Connors v. Gov't Employees Ins. Co.*, 442 Md. 466, 481–83, 113 A.3d 595, 603–05 (2015) (emphasis in original) (quoting *Megonnell*, 368 Md. at 655, 796 A.2d at 772).

Here, the relevant terms of the policies are unambiguous.  The First Policy (No. 3792430-14) (ECF 1-2), had an effective date of August 16, 2014 through August 16, 2015.  *Id.*  However, the First Policy was terminated on December 4, 2014, for non-payment of the premium.  *See,*

*e.g.*, ECF 1 ¶¶ 16, 20.  Therefore, no coverage was available to Rooding until the Second Policy, No. 3842216-15 (ECF 1-3), went into effect on March 31, 2015.  *Id.*  The Second Policy was to remain in effect until March 31, 2016.

Both policies provided that National would only provide coverage for incidents that occurred during the effective dates.  ECF 1-2 at 14; ECF 1-3 at 5.  In particular, the policies stated, *id.*:  "We will provide the coverages shown on the Declarations Page, contained in this policy and any endorsements, for any covered loss that occurs during the policy period, on the condition that you pay the premium and comply with the policy provisions."

As noted, Rooding reported the loss on May 1, 2015 (ECF 1 ¶ 24), without any indication of the actual date of loss.  *Id.*  According to National, "[t]here is absolutely no evidence that the boat sank before December 4, 2014", while the First Policy, Policy No. 3792430-14, was still in effect.  ECF 36-1 at 8.  Unless the Vessel sank prior to December 4, 2014, there is no coverage under the First Policy.  Further, National asserts: "There has never been any evidence presented by Mr. Rooding, or discovered in Plaintiff's investigation, which would establish" that the Vessel sank after March 31, 2015, when the Second Policy, Policy No. 3842216-15, went into effect.  ECF 36-1 at 8-9.

I am satisfied that plaintiff has demonstrated that the Vessel sank after the termination of the First Policy on December 4, 2014, and prior to the effective date of the Second Policy on March 31, 2015.  Therefore, no coverage is available to Rooding under either policy.

### 2.   The Policies are Void *Ab Initio*

National also seeks a declaration that the two policies are void *ab initio*,[6] due to Rooding's breach of the implied warranty of seaworthiness; breach of the doctrine of *uberrimae*

---

[6] *Ab initio* means "from the beginning."  Blacks L. Dictionary (10th Ed. 2014).

*fidei*; and breach of the "Fraud and Concealment" clause of the Policies.  ECF 36-1 at 13-19.  I shall address the doctrine of *uberrimae fidei*.

Under federal maritime doctrine, marine contracts are "*uberrimae fidei*–the highest degree of good faith is exacted of those entering it, for the underwriter often has no practicable means of checking on either the accuracy or the sufficiency of the facts furnished him by the assured before the risk is accepted and the premium and conditions set."  G. GILMORE AND C. BLACK, THE LAW OF ADMIRALTY, § 2-6 at 62 (2d ed. 1975) ("Gilmore and Black"); *see also Commercial Union Ins. Co. v. Detyens Shipyard, Inc.*, 147 F. Supp. 2d 413, 423 (D.S.C. 2001) ("[T]he doctrine of *uberrimae fidei* is a firmly entrenched federal doctrine . . . .").  Thus, "failure by the insured to disclose conditions affecting the risk, of which he is aware, makes the contract voidable at the insurer's option."  *Stipcich v. Metropolitan Life Ins. Co.*, 277 U.S. 311, 316 (1928) (citing, *inter alia*, *Livingston v. Md. Ins. Co.*, 6 Cranch (10 U.S.) 274 (1810)); *see also*, Gilmore and Black § 2-6 at 62 ("[T]he underwriter may avoid the policy if a willful misrepresentation, or an innocent one of a material fact, made by the assured in connection with the formation of the contract, has been one of the inducements to the underwriter's entering it.").

In other words, "[u]nder *uberrimae fidei,* when the marine insured fails to disclose to the marine insurer *all* circumstances known to it and unknown to the insurer which 'materially affect the insurer's risk,' the insurer may void the marine insurance policy at its option."  *Catlin at Lloyd's v. San Juan Towing & Marine*, 778 F.3d 69, 83 (1st Cir. 2015).  But, for a contract to be voidable, the fact that is either misrepresented or not disclosed must be "material."  *See, e.g.*, *Catlin at Lloyd's*, 778 F.3d at 83; *Certain Underwriters at Lloyds, London v. Inlet Fisheries Inc.*, 518 F.3d 645, 648 (9th Cir. 2008); *HIH Marine Servs., Inc. v. Fraser*, 211 F.3d 1359, 1362 (11th

Cir. 2000); *N. Am. Specialty Ins. Co. v. Savage*, 977 F. Supp. 725, 728 (D. Md. 1997); *see also McLanahan v. Universal Ins. Co.*, 1 Pet. (26 U.S.) 170, 298 (1828) ("If [an omission is] accidental, it would not prejudice the insurance, unless material to the risk.").  Materiality is determined by considering whether, given the circumstances of the case, the information omitted could "reasonably have affected the determination of the acceptability of the risk.'"  *N. Am. Specialty Ins. Co.*, 977 F. Supp. at 729 (quoting *Nationwide Mut. Ins. Co. v. McBriety*, 246 Md. 738, 744, 230 A.2d 81, 84 (1967)).

Various courts have found that the misrepresentation of the purchase price of a vessel by the insured constitutes a "material" breach, and thus permits the insurer to void the contract.  *See, e.g.*, *AGF Marine Aviation and Transport v. Cassin*, 544 F.3d 255, 264-266 (3rd Cir. 2008); *Certain Underwriters at Lloyds v. Montford*, 52 F.3d 219 (9th Cir. 1995); *see also New Hampshire Insurance Co. v. C'Est Moi, Inc.*, 519 F.3d 937 (9th Cir. 2008) ("'The fact that the insurer has demanded answers to specific questions in an application for insurance is in itself usually sufficient to establish materiality as a matter of law.'") (citation omitted).  For example, in *Cassin*, in evaluating whether an insured's misrepresentation of the purchase price of a vessel was material, the Third Circuit stated, 544 F.3d at 265: "We conclude that when a marine insurer asks for the purchase price, it is a fact material to the risk, the misrepresentation of which violates *uberrimae fidei*."  And, in *Montford*, 52 F.3d at 222, the Ninth Circuit determined that the insurance company could void a contract where the insured inserted the present market value of a vessel rather than the actual purchase price, when the application specifically requested the purchase price.

Here, National claims that Rooding misrepresented the purchase price of the Vessel as $25,000 when "he had paid no more than $9,500 . . . ."  ECF 36-1 at 18.  National states that

Rooding's misrepresentation resulted in the issuance of a policy covering the Vessel for $25,000. *Id.* According to National, Rooding's misrepresentation was a material breach of his obligations under the doctrine of *uberrimae fidei*, which "justifies the actions taken by the Plaintiff to void the policies *ab initio* . . . ." *Id.*

I am satisfied that National's undisputed allegations in the Complaint are sufficient for the Court to conclude that Rooding materially breached his obligations under the doctrine of *uberrimae fidei*. As noted, Rooding advised "National Liability that he purchased the Vessel for $25,000 after he was told that he could only insure the Vessel for the amount of his investment in the Vessel," and he failed "to disclose to National Liability that the actual purchase price of the Vessel was either $9,515.00 or $3,500.00 . . . ." ECF 1 ¶ 45. Additionally, with respect to the Second Policy, the Complaint indicates that Rooding omitted the purchase price of the Vessel, although it was requested on the application. ECF 1 ¶ 22. As a result, the policies are void *ab initio*.[7]

### III.    Motion for Attorneys' Fees and Costs

Fed. R. Civ. P. 4(d) provides the procedures for waiver of service. Rule(4)(d)(1) states: "An individual, corporation, or association that is subject to service under Rule 4(e), (f), or (h) has a duty to avoid unnecessary expenses of serving the summons. The plaintiff may notify such a defendant that an action has been commenced and request that the defendant waive service of a summons." According to Rule 4(d)(1)(F), the request for waiver must "give the defendant a reasonable time of at least 30 days after the request was sent . . . to return the waiver."

---

[7] Having determined that both policies are void *ab initio* under the doctrine of *uberrimae fidei*, I need not reach plaintiff's claims that the policies are void *ab initio* as a result of Rooding's breach of the warranty of seaworthiness or for breach of the "Fraud and Concealment" clause of the Policies. *Id.* at 19.

Rule 4(d)(2) provides remedies for the failure of a defendant to waive service.  It says, *id.* (emphasis added):

> If a defendant located within the United States fails, without good cause, to sign and return a waiver requested by a plaintiff located within the United States, the court must impose on the defendant:
>
> > (A) the expenses *later incurred* in making service; and
> >
> > (B) the reasonable expenses, including attorney's fees, of any motion required to collect those service expenses.

In 4A C. WRIGHT AND A. MILLER, FED. PRAC. & PROC. CIV. § 1092.1 (4th ed.) ("Wright & Miller"), it states:  "Under Rule 4(d)(2),[] *the defendant is liable for the costs and expenses of follow-up service* when the attempt to secure a waiver of formal service has been refused, as well as the reasonable expenses of any motion required to collect the costs of the follow-up service." (Emphasis added).  However, a defendant "who fails to comply with the request for a waiver of formal service can avoid liability for these costs only by showing 'good cause' for its failure to comply.[] The most obvious illustration of good cause would be never having received the notice and request for waiver and the complaint.[]"  *Id.*

Here, National claims that it is entitled to "the sum of $2,690 for reasonable attorneys' fees and costs incurred by Plaintiff in effectuating service upon Defendant, Ronald Rooding." ECF 35 at 2.  The docket reflects that National sent Rooding a request for a waiver of service to his home address, with the proper zip code, in accordance with the many requirements of Rule 4(d)(1).  *See* ECF 13; ECF 35-2, ¶¶ 3, 6.  The envelope was returned to National.  *See* ECF 35-1 at 3-4; ECF 15-1 at 14-15.  National alleges that it was Rooding who did so.  ECF 35-1 at 3. Moreover, National maintains that Rooding evaded service.  *See, e.g.*, ECF 35-2; *see also, e.g.*, ECF 15-1.  As a result, National asked the Court for leave to serve Rooding by posting the summons and complaint at his residence, and by sending the summons and complaint, by

certified mail and also by first class mail, to his Maryland address.  ECF 16; *see* ECF 15 at 2. The Court granted that request.  ECF 16.

Notably, Rooding has not responded to the Motion for Attorneys' Fees.  However, in Rooding's Motion to Vacate (ECF 25), Rooding said, through counsel: "Defendant was not present at the address where alternative service is said to have taken place during the periods in question.  Debtor [sic] was either in Florida or Chicago, Illinois."  *Id.* at 1.  And, he stated, *id.* at 2: "Defendant was not aware of any service until he approached Counsel about entering an appearance in his case, as Defendant was unaware of any activity in the case."

In the Motion to Vacate, Rooding did not address the two requests for waivers, sent on October 28, 2015 (ECF 10) and November 11, 2015 (ECF 13).  The dates of alternative service are not relevant to waiver.  Thus, Rooding's alleged absence from his home address at the time of alternative service on December 19, 2015 (ECF 20, posting) and January 13, 2016 (ECF 21, first class and certified mail) are of no moment.

Furthermore, with respect to Rooding's contention that he was "unaware of any activing in the case", Rooding does not dispute that the German Hill Road address in Dundalk is correct, nor does he challenge National's claims that he received and returned the two envelopes to National.  *See* ECF 15-1; ECF 25; ECF 29.  And, the Affidavit of Evasion (ECF 15-1 at 1-4), previously submitted by plaintiff in support of the Motion for Alternative Service, suggests that Rooding was present at his Maryland address on October 18, 2015, ten days before the first request for waiver was sent.  ECF 15-1 ¶ 15.

In light of the foregoing, I am satisfied that National properly requested a waiver of service, pursuant to Rule 4(d), and that Rooding has not shown good cause for his failure to waive service.  I turn to the amount of National's fee request.

21

As noted, National claims that it is entitled to a total of $2,690.00 as a result of Rooding's failure to waive service.  ECF 35-1 at 7-8.  That sum includes $2,535 for attorneys' fees and $155.00 for process server's fees.  *Id.*

Under Rule 4(d), a plaintiff may only recover costs *after* a defendant has failed to waive service.  *See* Wright & Miller § 1092.1.  National's second request for waiver of service was docketed November 11, 2015.  ECF 13.[8]  Under Rule 4(d)(1)(F), a defendant has 30 days to respond.  Therefore, plaintiff cannot recover for costs that were incurred prior to December 11, 2015.

The documentation furnished by plaintiff in support of its request for fees and costs shows that plaintiff seeks $85.00 for efforts at service that began on September 12, 2015, nearly two months before National sent a request for waiver of service to the proper address.  *See* ECF 35-8 at 2.  Moreover, plaintiff does not provide a sufficient breakdown for the Court to determine what expenses were incurred prior to December 11, 2015, and what expenses, if any, were incurred after that date.  Accordingly, plaintiff may only recover $70.00 for service of process that was attempted beginning on December 19, 2015.  *Id.* at 1.

Furthermore, National is not entitled to the $2,535 in attorneys' fees that it has requested.  Rule 4(d)(2)(B) limits the available attorneys' fees to "the reasonable expenses, including attorney's fees, *of any motion* required to collect those service expenses."  (Emphasis added).  The records that National submitted are not limited to the legal fees that National incurred in filing the Motion for Attorneys' Fees and to "collect" for "service expenses."  *See* ECF 35-7.  For example, ECF 35-7 at 5 includes time incurred to review the motion for entry of default.

---

[8] The first request for waiver of service (ECF 10), filed October 29, 2015, apparently was sent to Rooding using the wrong zip code.  Although National suggests that Rooding received it (ECF 35-1 at 3), National resubmitted the request for waiver, using the correct zip code.

Other fees pertain to the motion for alternative service.  *Id.* at 4.  These fees are not recoverable under the plain language of the rule, which limits recovery of fees to those attorneys' fees required to collect the service expenses.  *See Menke v. Monchecourt*, 17 F.3d 1007, 1011-12 (7th Cir. 1994), *superseded on other grounds*; *U.S. Engine Prod., Inc. v. AGCS Marine Ins. Co.*, 769 F. Supp. 2d 626, 629 (S.D.N.Y. 2011).  As the court said in *U.S. Engine Prod. Inc.*, "any attorneys' fees incurred in the process of effecting service are not recoverable under Rule 4(d)(2)."  769 F. Supp. 2d at 629.

Accordingly, by February 3, 2017, National shall submit a statement detailing the breakdown of the fees incurred in drafting its Motion for Attorneys' Fees and Costs (ECF 35), and any other fees to which it believes it is entitled under Rule 4(d)(2).  National may also submit a corrected account of the costs it incurred in attempting to serve Rooding.

## IV.    Conclusion

For the reasons set forth above, I shall grant the Motion for Default (ECF 36), in part, with respect to plaintiffs' claims that the policies did not apply coverage to the sinking of the Vessel and that the policies were void *ab initio* under the doctrine of *uberrimae fidei*.  And, I shall grant ECF 35, in part.  In particular, I shall award attorney's fees and costs, in an amount to be determined, provided that National submits appropriate documentation detailing the reasonable legal fees and costs that it is entitled to recover under Rule 4(d)(2), due by February 3, 2017.

An Order follows, consistent with this Memorandum Opinion follows.


Date:  January 20, 2017                                    _____/s/_____
                                                                    Ellen L. Hollander
                                                                    United States District Judge